KENNETH YOON
1154 S Plymouth Blvd., #2
Los Angeles, CA 90019
(213) 481-5867

Plaintiff in pro per



FILED
CLERK, U.S. DISTRICT COURT

JUN - 5 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

PAID

JUN - 5 2019

Clerk, US District Court
COURT 4612

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

**LACV1904897-RSWL-SSx**

| | |
|---|---|
| KENNETH YOON, AN INDIVIDUAL, | ) CASE NO: |
| *Plaintiff,* | ) **COMPLAINT FOR:** |
| | ) |
| | ) **1. BREACH OF CONTRACT;** |
| vs. | ) **2. BREACH OF THE IMPLIED** |
| | **COVENANT OF GOOD FAITH AND FAIR** |
| | **DEALING;** |
| | ) **3. NEGLIGENT MISREPRESENTATION;** |
| SAJO OYANG CORPORATION, A | ) **4. INTENTIONAL INTERFERENCE WITH** |
| FOREIGN CORPORATION; JIN WOO | **PROSPECTIVE ECONOMIC RELATIONS;** |
| JOO, AN INDIVIDUAL; SAJO GROUP, A | ) **5. INTENTIONAL INTERFERENCE WITH** |
| FOREIGN CORPORATION, | **CONTRACTUAL RELATIONS** |
| | ) |
| *Defendants.* | ) |

---

## **COMPLAINT**

Plaintiff Kenneth Yoon, an individual ("YOON"), brings this action against

Defendants Sajo Oyang Corporation, a Foreign Corporation ("OYANG"), Jin Woo Joo, an

Individual("JOO"), Sajo Group, a foreign corporation ("SAJO") and DOES 1 to 20, inclusive (collectively, "Defendants"), and in support thereof, alleges as follows:

## PARTIES AND JURISDICTION

1.          At all times relevant hereto, OYANG AMERICA, INC. ("OYANG AMERICA") is an American corporation duly organized and existing under the laws of the State of California. OYANG AMERICA is in the business of fishing and packing and it was formerly incorporated as Oyang America, Inc. in the state of California.

2.          At all times relevant hereto, Plaintiff KENNETH YOON ("YOON") is an individual residing in the United States. YOON was the president and the director of COOK ISLAND CHARTERS LIMITED, a New Zealand company ("COOK ISLAND CHARTERS"), and also was the president and the director of Oyang America, Inc.

3.          At all times relevant hereto, Defendant SAJO OYANG CORPORATION ("OYANG") is a South Korean corporation, new name for Oyang Corp. after being taken over by Defendant JOO and his Sajo Group ("SAJO"). Oyang Corp. used to be the parent company of Oyang America, Inc. that was duly organized and existing under the laws of the State of California. SAJO is also the 100% owner of Southern Storm, Inc., a New Zealand company that used to do business with YOON's COOK ISLAND CHARTERS in New Zealand.

4.          At all times relevant hereto, Defendant JIN WOO JOO ("JOO") resides in South Korea. Defendant JOO is the chairman and a major shareholder of Defendant OYANG and SAJO. Defendant JOO and his SAJO took over Oyang Corp. in Korea in 2007 and renamed it Sajo Oyang Corporation ("OYANG").

5.        Plaintiff has sued Does 1through 20, inclusive, by such fictitious names

because Plaintiff is uncertain as to the names, identities, legal responsibilities and/or

capacities of DOE Defendants. Plaintiff is informed and believes, and thereupon alleges that

each of the Defendants designated herein as a DOE Defendant was and is responsible in

some actionable manner for the events and incidents described in this complaint. Plaintiff will

seek leave of court to amend this pleading when the true names, identities and capacities of

each and/or any of DOE Defendants are ascertained by Plaintiff.


### VENUE

6.        Venue is proper in this district since Plaintiff is bringing this action against the

Defendants in overseas. All the actions described in this lawsuit either occurred in the United

States or in South Korea giving rise to this action occurred in this jurisdiction; and the harm

sustained by Plaintiff has occurred, and will continue to occur, in this jurisdiction.


### FACTUAL ALLEGATIONS

**A. Plaintiff YOON became the president of Oyang America, Inc., an American**
   **subsidiary of Oyang Corp. and Cook Island Charters Limited.**

7.        In 1992, YOON was named the president and director of Oyang America, Inc.

which used to be an American subsidiary company of Oyang Corp. of Korea ("Oyang Corp.").


8.        In 2005, Oyang Corp. asked YOON, as an American citizen, to purchase

OYANG 97, a 650-ton fishing vessel ("OYANG 97"), and operate in Cook Islands waters on

behalf of Oyang Corp.. In order to do business in New Zealand, YOON was also asked to

- 3 -

incorporate a company named COOK ISLAND CHARTERS LIMITED. True and correct copies of the correspondence regarding the incorporation of COOK ISLAND CHARTERS in Korean and the incorporation document are attached to this Complaint as **EXHIBIT A**.

### B. **YOON purchased OYANG 97 and began operating on behalf of Oyang Corp. as requested by Oyang Corp.**

9.        On or about July 2005, YOON, as requested by Oyang Corp., has purchased OYANG 97 from Oyang Corp. for $350,000.00. True and correct copies of the Bill of Sale of the purchase and the correspondence between YOON and Oyang Corp. in Korean are attached to this Complaint as **EXHIBIT B**.

10.        Representatives of Oyang Corp. assured YOON that Oyang Corp. would take full responsibility of all taxes and other dues owed to the United States by OYANG 97 in exchange for using YOON's name for the purchase and operation of OYANG 97. On or about August 2005, YOON's COOK ISLAND CHARTERS and SOUTHERN STORM FISHING LIMITED, a New Zealand company operated by Oyang Corp. entered into an agreement named as "Time Charter Agreement". A true and correct copy of the said agreement is attached to this Complaint as **EXHIBIT C**. A Fax message as a proof that OYANG 97 was doing business as a part of Oyang Corp.'s fishery lineups is attached to this Complaint as **EXHIBIT D**.

### C. **Oyang Corp. was taken over by JOO and his Sajo Group in Korea and they discontinued and dishonored Oyang Corp.'s relationship with YOON while taking over OYANG 97 from YOON only to have it disposed for scrap metal.**

11.        In 2007, Defendant JOO and his company SAJO took over Oyang Corp. after a controversial business take-over that took place in Korea. Right before the take-over, YOON was in the midst of discussing OYANG 97's accumulated taxes owed to the United States and other dues that were supposed to be paid by Oyang Corp. as previously agreed. During the take-over, SOUTHERN STORM FISHING LIMITED was also transferred to JOO and SAJO, and YOON was forced to sign over the possession of OYANG 97 even though YOON was the rightful owner of the vessel. OYANG 97 was disposed for scrap metal as a result of OYANG's internal political dispute. The taxes and dues owed have since been unsettled without OYANG or JOO or SAJO taking responsibility. A true and correct copy of the OYANG 97's disposal document from Korean government in Korean is attached to this Complaint as **EXHIBIT E**.

12.        Since this date, YOON has attempted to reach out to JOO and SAJO and its subsidiary companies including OYANG multiple times.

13.        On or about July 10, 2017, Ji Wook Kim, who was representing YOON and OYANG AMERICA went to Korea to have a meeting with Jung Soo Kim, the chairman of Sajo Industry at that time. The Meeting took place in the main headquarter of SAJO at Chungjung Ro, Seoul, South Korea. It was only when this meeting that took this place on this date, YOON became aware of Defendants' true intention. It was clear that Defendants had no intention of settling the debt that was owed to Plaintiff. True and correct copies of the letters YOON has sent to Defendants and their employees in Korean are attached to this Complaint as **EXHIBIT F**. On or about August 14, 2018, YOON, through his attorney, has sent a Letter of Demand for Payment to JOO in an effort to settle this claim before any civil action in the

court. YOON has not received any response from JOO to this date. A true and correct copy of the demand letter is attached to this Complaint as **EXHIBIT G**.

### D. How Defendant OYANG Breached the Agreement

13.     As alleged below, Defendant OYANG breached the oral and written Agreement.

14.     Pursuant to the Agreement and oral correspondence between YOON and OYANG's representatives, OYANG (Oyang Corp. at the time of the agreement) represented to YOON that YOON could use his name to incorporate the New Zealand corporation and purchase the OYANG 97 with which he can operate under his name and his company and all the taxes and dues would be paid by OYANG, not YOON or his company.

15.     Thereafter, Plaintiff has performed all of the conditions, covenants, and promises required to be performed in accordance with the terms and conditions required by the Agreements.

15.     However, the sudden change of the ownership that took place without Plaintiff's knowing, OYANG ignored all the promises that were made to Plaintiff in its previous agreement and OYANG, as the same company as Oyang Corp., breached all the agreements that were made between Plaintiff and Oyang Corp..

16.     Due to Defendant OYANG's lack of funding and refusal to pay the taxes and dues, YOON's fishing operation was heavily delayed, which resulted in YOON's loss of income and closing the business eventually.

17.     In addition, Defendant JOO and SAJO took the possession of OYANG 97 forcefully from Plaintiff without any legitimate reason.

### E. How Defendants JOO and SAJO Interfered with Plaintiff's Business

18.        As alleged above, Defendant JOO is the new president of OYANG which

YOON worked with as the president of its American subsidiary company, Oyang America.

19.        As alleged above, Defendant SAJO is the company that took over OYANG and

its foreign subsidiary companies such as SOUTHERN STORM FISHING LIMITED.

20.        After Defendants JOO and SAJO took over OYANG, Defendants JOO and

SAJO in concerted efforts commenced a course of conduct designed to, and which did and

continues to, interfere with Plaintiff's fishing business.

21.        Defendants JOO and SAJO, without any notice to Plaintiff, selectively

performed the take-over of OYANG 97 which legally belonged to Plaintiff, which caused

Plaintiff to stop being able to operate in any way. Defendants also refused to pay Plaintiff for

the taxes and dues that Plaintiff had to pay for the business.

### FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

### (AGAINST DEFENDANT OYANG)

22.        Plaintiff hereby incorporates by reference each of the paragraphs set forth

above as though fully set forth hereinafter.

23.        Plaintiff entered into oral and written agreements with Defendant OYANG

for the fishery business involving OYANG 97 upon request of OYANG.

24.        Plaintiff has performed all of the conditions, covenants, and promises

required to be performed in accordance with the terms and conditions required by the

Lease and the amendments thereto.

25.    As alleged above, OYANG has breached the agreements to the effect that Plaintiff's right to the financial support and tax payment was interrupted.

26.    As a direct and proximate result of failure and refusal as herein alleged, Plaintiff has suffered damages from loss of incomes, taxes and dues owed and will continue to suffer, damages exceeding $2,946,000.00 due to the forced take-over of the OYANG 97 and refusal to pay for the taxes and dues.

## SECONDCAUSE OF ACTION

## BREACH OF THE IMPLIED COVENANT

## OF GOOD FAITH AND FAIR DEALING

### (AGAINST DEFENDANT OYANG)

27.    Plaintiff hereby incorporates by reference each of the paragraphs set forth above as though fully set forth hereinafter.

28. As a result of the contractual relationships which existed between Plaintiff and Defendant OYANG (hereinafter "Defendant"), respectively, on the one hand, and Defendants, on the other hand, the expressed and implied promises made in connection with those relationships, and the acts, conduct, and communications resulting in these implied promises, Defendant promised to act in good faith toward and deal fairly with Plaintiff which requires, among other things:

   a. Each party in the relationship must act with good faith toward the other concerning all matters related to the agreements described herein:

   b. Each party in the relationship must act with fairness toward the other concerning all matters related to their agreements;

   c. Neither party would take any action to unfairly prevent the other form obtaining the benefits of their agreements;

29.     Defendant's breach of each of the agreement with Plaintiff were wrongful, in bad faith, and unfair, and therefore a violation of Defendant's legal duties. Plaintiff further alleges that Defendant breached the covenant of good faith and fair dealings when they:

   a. Repeatedly refused to abide their own promises when dealing with Plaintiff;

   b. Repeatedly denied to pay back the dues and the taxes owed to Plaintiff.

   c. Forcefully took over the possession of Plaintiff's OYANG 97 only to dispose it as scrap metal.

30.     Defendant's breach of the covenant of good faith and fair dealingwasasubstantialfactorincausingdamageandinjurytoPlaintiff.Asadirectand proximate result of Defendants' wrongful conduct alleged in this Complaint, Plaintiff has lost substantial benefits with Defendants, including lost income and business, and other benefits in an amount exceeding $2,946,000.00,theprecise amount of which will be proven at trial.

## THIRD CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

## (AGAINST DEFENDANT OYANG)

31.     Plaintiff incorporates by reference the preceding allegations as if set forth fully herein.

32.     As described in paragraph 38 above, Defendant made representations of material fact to Plaintiff, which were in fact false at the time that they were made.

33.     At the time Defendants made the representations mentioned above, Defendant did not have reasonable grounds for believing them to be true.

34.     Plaintiff, at the time these representations alleged were made by Defendant and at the time and prior to the agreements, was ignorant of the falsity of Defendant's representations described above and believed them to be true.

35.     Further, as described above, Defendant concealed material facts from Plaintiff.

36.     Defendant made the representations and concealed material facts with the intent to deceive Plaintiff and for purposes of inducing Plaintiff into keep operating OYANG 97 for Defendant's benefit.

37.     Plaintiff, in reliance on the representations mentioned above,executed the agreements. If Plaintiff knew the true facts for said false representations, Plaintiff would not have entered into the agreements.

38.     As a direct and proximate result of the said Defendant's foregoing conduct, Plaintiff has been harmed in an amount to be proved at trial exceeding $2,946,000.00 against Defendant.

## FOURTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH

## PROSPECTIVE ECONOMIC RELATIONS

## (AGAINST ALL DEFENDANTS)

39.     Plaintiff incorporates by reference the preceding allegations as if set fourth fully herein.

40.     At all relevant times herein, Plaintiff had various economic relationships with New Zealand, Cook Islands, and United States government that were willing, and able to do business with Plaintiff which would have resulted in economic benefits.

41.     Defendants knew or should have known about these prospective relationships.

42..    As alleged above, Defendants acted intentionally to disrupt the relationships between Plaintiff and the governments by doing the things alleged therein.

43.     As a direct and proximate result of Defendants intentional acts that disrupted Plaintiff's continuing and prospective economic relationships with the governments, Plaintiff has sustained actual and consequential damages, including the loss of business, business opportunities, revenue, good will, and profits, and Plaintiff will continue to suffer similar losses after the filing of the Complaint in an amount to be proved at trial exceeding $2,946,000.00.

44.     Defendants' conduct described above constitutes fraud, oppression and malice within the meaning of California Civil Code §3294 and thus, justifies the awarding of exemplary and punitive damages.

## FIFTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH

## CONTRACTUAL RELATIONS

### (AGAINSTDEFENDANT JOO AND DEFENDANT SAJO)

45.     Plaintiff incorporates by reference the preceding allegations as if set fourth fully herein.

46.     Plaintiff had entered into contracts with Defendant OYANG before Defendant JOO and SAJO took over Defendant OYANG

47. Defendants JOO an SAJO knew or should have known about these contracts.

48.     As alleged above, Defendants JOO and SAJO acted intentionally to disrupt the contractual relationship and their conduct prevented performance of OYANG.

49.     Defendants JOO and SAJO intended to disrupt the performance of these contracts and knew that such actions would disrupt the performance.

50.     As a result Plaintiff was harmed in the amount of at least $2,946,000.00 and Defendants JOO and SAJO's conducts were substantial factor in causing Plaintiff's harm.


### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

1. For damages in the sum of $2,946,000.00 together with prejudgment interest thereon and according to proof plus damages in such further sum as may be sustained by proof and ascertained before final judgment herein;

2. For costs of suit incurred herein; and

3. For such other and further relief as the Court may deem just and proper.


Dated: May 31, 2019

                    Respectfully submitted,

                    BY: _____

                        KENNTH YOON

**Exhibit A**



**오양수산**
OYANG CORPORATION

100 -101
서울특별시 중구 태평로 1가 76-3 (02)721- 6500~9 / FAX. (02)722-7879

부산공장 (051)254-8011~5 / FAX. (051)243-5832  부산사무소 (051)241~2701~2 / FAX. (051)243-3745  안성공장 (031)673-2900~1 / FAX. (031)873-1825

| FAX NO | : 001 1 213 365 8670 | DATE | : 2005. 5. 26. |
|---|---|---|---|
| TO | : OYANG AMERICA. | FROM | : D.W CHA. Fisheries Dept. |
| ATTN | : 윤 경원 사장님. | OUR REF. | : |

Total  1  page(s) including this sheet.

SUBJECT    <u>COOK ISLAND 회사 설립</u>

안녕 하십니까?
FAX 보내주신 내용 검토하고, 전화로 상의한 사항 다음과 같이 정리하여 연락 드
립니다:

1. <u>REQUEST TO INCORPORATE</u>:
   가. Signed by 다음에 성명 기입.
   나. 날짜 기입 및 우측에 서명.
   다. WITNESS의 서명 그리고 성명, 주소, 직업, 날짜 기입.

2. <u>FORM A</u>:
   가. 1항 Individual Details 의 *Occupation 란 기입.
   나. 2항 Verification of Identity(전화로 의논한 바와 같이)
      a) 사진 보이는 여권 첫 Page 사본 확인 본, 그리고
      b) 1년 이상 거래은행의 Bank Reference 원본.
   다. 서명 및 날짜 기입.

3. <u>COMPANY RELATION FORM</u>:
   가. 1.4항 Purpose of Company/Description of the business of the
      Company: Fishing, Fish processing and Trading.
   나. 1.5항 자금조달 방법: <u>의견 조정 중.</u>
   다. 서명 및 날짜 기입.   입회인 서명 그리고 성명, 직업, 주소, 날짜
      기입.

4. 우선 준비된 <u>REQUEST TO INCORPORATE</u> 및 <u>FORM A</u> 두 가지만 먼저
DHL편 Cook Islands Trust Corporation Limited로 송부해 주시고, 사본은 OCEANLAW 앞
으로 FAX 바랍니다.   <u>COMPANY RELATION FORM</u>은 준비 되는대로 따로 보내달라는 NZ
변호사 요청입니다.

"끝"



## COOK ISLANDS **TRUST**
### C O R P O R A T I O N   L T D

First Floor, BCI House, PO Box 141, Rarotonga, Cook Islands

ph '682 24 538  fax '682 24 539  email info@citrust.org.ck  web www.cookislandstrust.com

# COMPANY RELATIONSHIP FORM

This form should be completed by the beneficial owners / shareholders of the proposed company. All beneficial owners / shareholders are required to sign the form. The information provided is confidential to CIT and will be maintained in secure storage in the Cook Islands in strict accordance with Cook Islands secrecy provisions.

## SECTION ONE              COMPANY DETAILS

1.1    **Name of Company  COOK ISLAND CHARTERS LIMITED**

1.2    **Shareholders / Beneficial owners**

      Name:(1) KENNETH WON YOON

      Name:(2) _____

      Name:(3) _____

      **Note:** The attached **Form A – Individual Information** must be completed by each individual shareholder, beneficial owner, and director of the company. If they are not a natural person then a representative should complete **Form B – Body Corporate Information.**

1.3    **Directors**

      Name:(1) KENNETH WON YOON

      Name:(2) CLARION LIMITED

      Name:(3) _____

      **Note:** The attached **Form A – Individual Information** must be completed by each individual shareholder, beneficial owner, and director of the company. If they are not a natural person then a representative should complete **Form B – Body Corporate Information.**

1.4    **Purpose of Company / Description of the business of the Company:** _____
       **INTERNATIONAL FISHING COMPANY**

1.5    **How have the capital or funds been acquired/from what source/from what business activity? (Please provide detailed description – documentation or proof of source of funds may be required).**

    Funds have been required from KENNETH WON YOON'S
    Personal saving account#710184 of Saehan Bank at
    Los Angeles Ca U.S.A. (Attachment for Information)
    **Note:** We are required under Cook Islands law to make proper enquiries to ensure that all assets are sourced from lawful activity.

**Director No.2**
      Name:  CLARION LIMITED
      Address:_____
            _____

      Telephone Number:   _____
      Facsimile Number:    _____
      Email Address:       _____

**Secretaries**
The resident secretary shall be **Secretaries Limited.**

**Additional Secretary (Optional)**
The following person is to be appointed as non-resident secretary of the company:

1.    Name:  N/A_____
2.    Address:_____
           _____
3.    Telephone Number:   _____
4.    Facsimile Number:    _____
5.    Email Address: _____

**Form A and Form B – Client Information Forms**

The appropriate client information forms for KENNETH WON YOON are attached
hereto.

**Instructions and Recommendations**
You are to accept instructions and recommendations relating to the control of the
shares and shareholders vote and the operations of the company from myself, or from
person/s I authorise in writing. All instructions are to be in writing, (whether letter,
fax, or email) and to be signed by me or any person authorised by me [except for
email which shall be accepted by you if it purports to be sent by me or any person
authorised by me].

**Confirmation of Incorporation**
CIT is to confirm registration immediately the company is incorporated to **MARTY
LOGAN** at Fax No. **00 64 3 548 4195** and forthwith forward copies of the following
documents also:
    (a)    First Certificate of Incorporation
    (b)    First page only of the Memorandum & Articles of Association

**Formal Documents to Client**
Certified Copies of the formal documents of the company, as set out below shall be
Couriered to MARTY LOGAN at OCEANLAW NEW ZEALAND, 14 NEW
STREET, NELSON, NEW ZEALAND

    (a)    First Certificate of Incorporation
    (b)    Full set of Memorandum & Articles of Association

ph +64 3 548 4136

fax +64 3 548 4195

martylo@oceanlaw.co.nz

www.oceanlaw.co.nz

# Exhibit B

 **오양수산**
OYANG CORPORATION

100 −101
서울특별시 중구 태평로 1가 76−3 (02)721− 6500~9 / FAX. (02)722−7879

부산공장 (051)254−6011~5 / FAX. (051)243−5832 부산사무소 (051)241−2701~2 / FAX. (051)243−3745 안성공장 (081)673−2900~1 / FAX. (031)673−1825

| FAX NO : 001 1 323 737 8507 | DATE : 19 July 2005 |
|---|---|
| TO : OYANG AMERICA. | FROM : 수산부 차 대응 |
| ATTN : Mr K.W. Yoon, President | OUR REF. : |

Total 3 page(s) including this sheet.

SUBJECT <u>NZ 선박 등록</u>

윤 사장님 안녕 하십니까?

뉴질랜드 오양 97호 COOK ISLAND 등록 관련하여 뉴질랜드 변호사 요청대로 별첨
BILL OF SALE 서명 날인하여 보내드립니다.

뉴질랜드 OCEANLAW의 MARTY LOGAN 으로부터 받은 메일도 참고로 별첨 합니다.

수고 하실시오

유   첨 : BILL OF SALE 1부.         "끝"



# COOK ISLANDS
## BILL OF SALE

Ship Registration
**FORM NO. 9**

| OFFICIAL NUMBER | CALL SIGN | IMO NUMBER | NAME OF SHIP | YEAR | PORT OF REGISTRY |
|---|---|---|---|---|---|
|  | DTAC7 | 7123693 | OYANG 97 |  | PUSAN |

| GROSS TONNAGE | 644 | NET TONNAGE | 299 | TYPE OF VESSEL | Fishing |
|---|---|---|---|---|---|

The Transferor (Seller(s) (a)  OYANG CORPORATION_____

of (address)  76-3, I-ga, Taepyung-no, Joong-ku, Seoul, South Korea_____

in consideration of the sum of  (in figures and in letters)  US$350,000 (three hundred and fifty thousand US dollars) _____

paid to the Transferor on behalf of the Transferee (Buyer(s) (b)  Cook Island Charters Limited_____

of (address) First Floor, BCI House, PO Box 141, Rarotonga, Cook Islands_____

the receipt of which is acknowledged, transfers to the Transferee (c) 64_____

shares in the ship described above, and in its boats and appurtenances.  Further, the transferor covenants with the transferee that the transferor has

power to transfer the shares and that the same are free of encumbrances (d) _____

Dated at _____ on the _____ day of _____ 20 _____

**TRANSFEROR:**

_Myung Hwan Ku_ [seal]

(Signature / Seal)

In the presence of:

(Signature) _____

(Name): DAE WOONG CHA_____

(Title): DIRECTOR_____

(Address): 76-3, 1-Ka, Taepyung-no, Joong-ku, Seoul, Korea

(a)   Insert the full name of each registered owner.

(b)   Insert the full name and address of each transferee. NOTE: Where there is more than one transferee, the transferees are joint owners.

(c)   Insert the number of shares.

(d)   If there are any subsisting encumbrances, add "save as appears on the register of the said ship."

NOTES: 1.   If the owner is a Corporation the Bill of Sale should be made on behalf of the Corporation by an Officer of the Corporation
authorised for the purpose and under the seal of the Corporation.

2.   The expression "Transferor" and "Transferee" used in this document shall include their heirs, successors, assigns, executors and
administrators or any other legal representative.



# COOK ISLANDS
# DECLARATION OF OWNERSHIP
# BY OWNERS

Ship Registration
**FORM NO. 2A**

**\*For Registry Office Use**

| OFFICIAL NUMBER | CALL SIGN | IMO NUMBER | NAME OF SHIP | YEAR | PORT OF REGISTRY |
|---|---|---|---|---|---|
| * | * | 7123693 | **ORION STAR** | **2005** | **AVARUA** |

### PARTICULARS OF SHIP

| NAME OF SHIP | FORMER NAME (if changed) | PRESENT FLAG AND PORT OF REGISRTY | PRESENT OFFICIAL NUMBER |
|---|---|---|---|
| **ORION STAR** | **OYANG 97** | **KOREA; BUSAN** | **9912001-6260001** |
| VESSEL TYPE | LENGTH OVERALL | GROSS TONNAGE | NET TONNAGE |
| **FISHING VESSEL** | **61m** | **644** | **299** |

The above ship is described in more detail in the cetificate of registry.

### PARTICULARS OF OWNER

Name: **COOK ISLAND CHARTERS LIMITED**
Address/Registered Office: **1ˢᵗ FLOOR, BCI HOUSE, PO BOX 141, RAROTONGA, COOK ISLANDS**
: Phone - **001 213 216 9075**
: Facsimile - **001 323 737 8507**
: Email - **arcticfresh@yahoo.com**       Interest in Ship: **OWNER**
If a Corporation:
: Place and date of incorporation – **RAROTONGA**
: Principal place of business - **RAROTONGA**
: Name and address of officers: - **KENNETH WON YOON, 645 N WILCOX AVE #3A, LOS ANGELES CA 90004, USA**
**CLARION LIMITED, 1ˢᵗ FLOOR, BCI HOUSE, PO BOX 141, RAROTONGA, COOK ISLANDS**

### DECLARATION BY OWNER (1)

I, (full name) **KENNETH WON YOON**
Of (address) **645 N WILCOX AVE #3A, LOS ANGELES CA 90004, USA**
(occupation ) **COMPANY VICE PRESIDENT**
Declare:
1. I am an officer of the Owner referred to above and duly authorized to make this declaration (2).
2. The above particulars of the ship are correct.
3. The ownership in the ship is evidenced by a Bill of Sale/other document, the original/certified copy of which is attached
4. The Owner referred to above is the only person entitled to the legal and beneficial interest in the ship
5. The Owner is entitled to be registered as the Owner of the interest in the ship referred to above; or
Declared Before me:

_(signature)_ (4)    _(signature)_

(Signature of Declarant)    (Signature of Witness)

**7-19-05**    **paralegal**

(Date)    (Occupation)

**9100 Wilshire Blvd, Ste. 530 E**
**Beverly Hills, CA 90212**
(Address)

NOTES:
1. I am the Owner referred to above/an officer of the Owner referred to above and duly authorized to make this declaration (2).
2. If declarant is an authorized officer, attach authority.
3. If there are persons other than the Transferee who are entitled to a legal or beneficial interest in the ship (e.g. a mortgagee), attach details.
4. Declarations shall be made before a Registrar or Justice of the Peace, or a Commissioner for Oaths, Solicitors, Notary Public or a Consular Officer or before any person authorized by law to administer oaths in the country where the declaration is made.

# COOK ISLAND CHARTERS LIMITED

**DIRECTORS RESOLUTION**

**Background**

By Contract dated 7 May 2005 between Oyang Corporation and Kenneth Yoon on behalf of a Company to be incorporated in the Cook Islands, Oyang agreed to sell and Kenneth Yoon agreed, on behalf of the Company to be incorporated, to purchase the fishing vessel Oyang 97.

Cook Island Charters Limited ("the Company") was incorporated on the 7th day of July 2005 and is the Company on behalf of which Kenneth Yoon entered into the Contract.

By Special Resolution the company's shareholders resolved to ratify the Contract with the intent that the Company be bound by the terms of the Contract in place of Kenneth Yoon.

**IT IS RESOLVED:**

1.  That the Company ratifies the Contract with the intent that the Company be bound by the terms of the Contract in place of Kenneth Yoon.

2.  That the vessel be registered in the Cook Islands.

3.  That Gyeong Su Mun be appointed as a Manager to act on behalf of the Company in relation to the above named vessel.

4.  That Clarion Limited be appointed as the Cook Islands local agent for the vessel, to accept service of any legal process and to meet the Company's responsibilities in accordance with laws and regulations of the Cook Islands.

5.  That the Company enters into a time charter arrangement with Southern Storm Fishing Limited of Christchurch, New Zealand whereby the vessel will be operated in New Zealand's EEZ.

Signed this          day of July 2005

...................................................
K W Yoon

...................................................
Clarion Limited

# COOK ISLAND CHARTERS LIMITED

**SHAREHOLDERS RESOLUTION**

The Shareholders hereby resolve to approve the ratification by the Company of an Agreement entered into by Kenneth Yoon on behalf of the Company to be formed to purchase the fishing vessel Oyang 97 from the Oyang Corporation of Korea.

The Directors are authorised to take all steps required to complete the purchase of the vessel including registering it in the Cook Islands.

.................................................

K Yoon as Shareholder

**Exhibit C**

**BETWEEN**        **COOK ISLAND CHARTERS LIMITED**
                    ("Owner")

**A N D**          **SOUTHERN STORM FISHING LIMITED**
                    ("Charterer")

---

### TIME CHARTER AGREEMENT

---

*[handwritten notes in Korean and English:]*
Kennesh Yoon 명의의 CICL 과
온흥일사 북가라그 기산 Southern Storm의
0 yang 97호 온흥 agreement



OCEANLAW NEW ZEALAND

## TIME CHARTER AGREEMENT

BETWEEN **COOK ISLAND CHARTERS LIMITED** a company organised and existing under the laws of the Cook Islands, c/o Cook Islands Trust Company Limited, First Floor, BCI House, PO Box 141, Rarotonga, Cook Islands ("the Owner")

AND **SOUTHERN STORM FISHING LIMITED** a company duly incorporated pursuant to the laws of New Zealand having its registered office at 84 Stanleys Road, Christchurch ("the Charterer")

WHEREAS

A.   The Owner is the Owner of the fishing vessel *Oyang 97* ("the vessel") as described in schedule one to this agreement;

B.   The Charterer has or will acquire Individual Transferable Quota ("quota") and/or Annual Catch Entitlement ("ACE") which will give Charterer the right to target and catch specified quantities of fish in defined areas within the New Zealand Exclusive Economic Zone, using a vessel chartered from domestic or foreign Owners;

C.   The parties wish to enter into the charter of the vessel in accordance with the terms of this agreement.

WHEREBY THE PARTIES AGREE:

**1.   Interpretation**

1.1.   In this Agreement:

1.1.1.   Clause and other headings are for ease of reference only and shall not be deemed to form any part of the context or to affect the interpretation of this Agreement.

1.1.2.   References to persons shall be deemed to include references to individuals, companies, corporations, firms, partnerships, joint ventures, associations, organisations, trusts, states or agencies of state, government departments and local and municipal authorities in each case whether or not having separate legal personality.

1.1.3.   Words importing the singular number shall include the plural and *vice versa*.

1.1.4.   Any obligation not to do anything shall be deemed to include an obligation not to suffer, permit or cause that thing to be done.

1.1.5.   References to a statute include references to regulations, orders or notices or any other form of legally binding notification for the purpose of implementing the provisions of such statute and references to a statute or regulation whether by subsequent state or otherwise and a

statute or regulation passed in substitution for the statute or regulation referred to.

**2.      Nature and Term of the Charter**

2.1.    The charterer charters the vessel described in schedule 1 to this agreement. The Charter shall be a time charter and the Owner shall at all times retain possession and control of the vessel.

2.2.    The charter shall be deemed to have commenced on 7 July 2005, at the Port of Lyttleton, New Zealand, in accordance with the terms of this agreement.

2.3.    This agreement shall apply for a fixed term to all fishing undertaken by the Owner on behalf of the Charterer for a period of 364 calendar days from 7 July 2005 ("the term").

**3.      Off Hire Provision**

3.1.    The parties agree the Owner may from time to time during the term of the charter operate the vessel under other charter arrangements within New Zealand Fisheries waters, or on its own behalf on the High Seas, and that this agreement shall not apply to any such fishing. Whilst the vessel is fishing under other agreements; the vessel is deemed to be "off hire" to the charter. The Owner shall keep the Charterer reasonably informed of the future fishing intentions for the vessel and shall give the Charterer one month's notice of its intention to operate the vessel under other charter arrangements.

**4.      Supply of fishing vessels**

4.1.    For the purpose of carrying out its obligations under this agreement, the Owner will initially provide and use the vessel as set out in Schedule One to this Agreement ("the vessel"). The Owner warrants that the vessel has the capacity and equipment and is otherwise satisfactory in all respects to catch and process fish taken under the quota or ACE.

4.2.    The Owner has the right; in consultation with the Charterer to substitute the vessel nominated under schedule one, with a suitable replacement vessel, subject to the operational requirements of the charter. Any such replacement vessel must be of similar capacity and condition. The terms of this agreement shall apply *mutatis mutandis* to such vessel.

4.3.    The Owner shall immediately advise the Charterer of any loss of or damage to the vessel that may affect its ability to continue fishing. If, after consultation with the Owner, the Charterer considers that there is a material risk of all the quota not being caught and processed before the end of the relevant fishing year or the expiry of this agreement (whichever is the earlier), the Charterer may request the Owner to replace the vessel and Owner shall use his best endeavours to replace the vessel with another vessel of similar condition, capacity and equipment.

4.4.    The Owner warrants that the vessel is free of any encumbrances, contractual commitments or other obligations which may prevent or hinder the performance by the Owner of its obligations under this Agreement.

## 5.    Registration of the vessel

5.1.    The vessel shall during the term of this agreement be registered by the Charterer as a foreign owned New Zealand fishing vessel.

5.2.    The Charterer shall make all reasonable efforts to register the vessel pursuant to s 103 of the Fisheries Act including the obtaining of all consents required under the rules for such registration.   If any consent is refused, or if such consent is granted on conditions unacceptable to the Charterer, the Owner or the Charterer may terminate this Agreement in accordance with Clause 23.

5.3.    The Owner shall be responsible for the vessel being fully manned by sufficient officers and crew with the necessary qualifications, immigration, and visa and work permit status for the purposes of deep-sea trawling pursuant to this agreement. All officers and crew shall, at the commencement of the charter hold immigration and work permits for not less than twelve months. All Master, officers and crew shall be engaged by the Owner or the Owner's agent.

5.4.    The Owner's officers and crew aboard the vessel shall be subject to the laws and regulations of the vessel's flag state, but shall otherwise observe the laws and customs of New Zealand.

## 6.    Compliance with statutory obligations

6.1.    The Owner shall ensure that the vessel shall, at the commencement of and throughout the agreement be in seaworthy condition and shall be equipped with a full set of operational modern fishing gear, factory and fish processing equipment.

6.2.    The Owner may ensure that the vessel shall at all times have on board such valid, current certificates of survey and licences as are within its power to obtain as may be required by:

6.2.1.    Maritime Safety Authority ("MSA");

6.2.2.    Ministry of Fisheries ("MOF");

6.2.3.    Ministry of Agriculture & Food - Quality Management Services Division ("MAFQual");

6.2.4.    The vessel's Classification Society.

6.3.    The Owner shall ensure that the Master, officers and crew of the vessel are fully briefed on the terms and conditions of this agreement and the applicable Fisheries Acts and Regulations of New Zealand.

6.4.    The Owner shall inform the Master and officers of the vessel of the severe penalties under New Zealand law for breach of or failure to comply with the Fisheries Acts and Regulations.

6.5.    The Owner shall take such steps as are lawfully required by MOF and MSA and any other authority having jurisdiction, for use and operation of vessel, fishing gear and fish processing equipment.

6.6.    The Owner shall arrange for a New Zealand based consultant who is familiar

with the fishing and maritime laws of New Zealand to keep the Owner and the Charterer advised of any changes to fishing or other laws that may affect the vessel or its operations in New Zealand fisheries waters and to assist the owner in discharging its obligations to comply with New Zealand Fisheries and Maritime Laws.

6.7.    The Charterer shall at all times retain the absolute right to audit the Owner's vessel, master or crews compliance with the laws of New Zealand and shall be entitled to inspect any records, fish product, equipment or environs of the vessel for that purpose without notice to the owner.  The Owner shall have an obligation of utmost good faith in assisting any audit by the charter or its agents in accordance with this clause.

## 7.    The Charterer's obligations

7.1.    The Charterer shall, apply for, obtain, maintain or otherwise ensure the availability of all such fishing permits, ACE, vessel registration, and any other licences, consents or statutory authorities that may be required for the vessel to fish in the New Zealand EEZ in accordance with this agreement.

7.2.    The Charterer shall assist the Owner to obtain any licences, registrations or authorities that the Owner is responsible for obtaining under this agreement.

## 8.    Fishing on behalf

8.1.    The Charterer engages the Owner as its agent to catch and process all fish taken under authority of the fishing permits and quota made available by the Charterer under this Agreement.

8.2.    For the avoidance of doubt the parties acknowledge that the Charterer shall at all times remain the holder of the quota and/or ACE and this Agreement shall not create any interest in the quota and/or ACE in favour of the Owner.

8.3.    Should the Charterer, at any time during the term of this agreement, engage the Owner to catch and/or process any additional fish under quota (not described in Appendix II) and/or any non-quota species, the rights and obligations of the parties in respect of that additional quota or non-quota species shall, in the absence of written agreement to the contrary, be governed by this agreement, with all necessary modifications.

8.4.    It is acknowledged that the Owner is not the partner, agent or employee of the Charterer and nor is the Charterer the partner, agent or employee of the Owner except as may be otherwise specifically stated to the contrary in this agreement.

8.5.    Nothing in this agreement shall confer any authority on the charterer to conclude any contract on behalf of the owner unless this has first been specifically agreed both parties.

8.6.    All fishing shall be in accordance with the Fishing plan provided by the Charterers.

## 9.    The Master and Crew

9.1.    During the term of this agreement it shall be the responsibility of the Owner to provide suitably qualified masters, officers and crew ("the Master and Crew")

for the vessel and any replacement crew that the Owner considers necessary for the safe and efficient operation of the vessel.

9.2. The Master and Crew of the vessel do not and will not at any time have a master/servant, employee or contractual relationship with the Charterer.

## 10. Charterer's representatives and observers

10.1. The Owner shall allow the Charterer to keep, at the Charterer's expense, up to two employees of the Charterer aboard the vessel during the term of this agreement.

10.2. The Owner shall permit placement on board the vessel of such scientific and technical observers as MOF may require.

10.3. The Owner shall provide accommodation, food and overalls to such Charterer's employees and scientific and technical observers on board the vessel.

## 11. Fishing in New Zealand Fisheries waters

11.1. When fishing in waters under the jurisdiction of the New Zealand Government, the Owner shall ensure that the vessel shall comply with the New Zealand Fisheries Act 1996 and all related amendments and regulations and all other applicable New Zealand legislation. The owner acknowledges that this clause is of special importance to the charterer, any breach of which shall go to the essence of the contract.

11.2. The Owner shall ensure that the Master of the vessel and their officers and crew are fully conversant with and, at all times, comply with the New Zealand Acts and Regulations pertaining to fishing activities including but not limited to the Marine Mammals Protection Act 1978 and other conservation requirements arising such as in respect of seabird deaths and disposal of rubbish.

11.3. The Owner shall ensure that the vessel has an effective net monitoring system that complies with MOF Regulations. The net-sonde monitor cable system is not permissible in New Zealand waters.

11.4. The Owner will ensure that Automatic Location Communicators (ALC) type approved by MOF is fitted to the vessels operating under this Agreement.

11.5. Quota allocations by fishing area and fish species for the purposes of this agreement are set forth in Appendix II.

11.6. The Owner shall ensure that the Master of the vessel complete all required fishing returns, and all other documents and records required by MOF Department of Conservation, MSA, MAF Qual, or the Charterer relating to the activities or operation of the vessel.

## 12. Port calls

12.1. The Owner may in its sole discretion appoint the Charterer as general agent for purposes relevant to the lawful operation of the vessel not elsewhere provided for in this Agreement, and may permit by prior written notice the Charterer to appoint sub-agents in other ports if necessary on behalf of the Owner. The Charterer shall not however be an agent for the purposes of sections 103 and

nor other provisions of the Fisheries Act 1996.

**13.    Radio**

13.1.    The Owner shall make available to the Charterer, on a daily basis, the following information by radio, fax or Satcom:

13.1.1.    Fisheries area in which the vessel is located; and

13.1.2.    Exact position of the vessel; and

13.1.3.    Total green weight, by species, on board the vessel; and

13.1.4.    Production weight by species on board the vessel; and

13.1.5.    Total product weight by species on board the vessel; and

13.2.    The Owner shall notify the Charterer 24 hours in advance of arrival of the vessel at port, and in advance of the vessel entering fishing areas referred to in Appendix II hereto.

13.3.    The port of call for the vessel shall at all times be agreed with the Charterer before entering port.

13.4.    All daily information shall be as at 2400 hours of each calendar day and shall be communicated to the Charterer no later than 1000 hours the following day.

13.5.    The Owner shall provide the Charterer with all information lawfully requested by MOF.

13.6.    The Owner shall require the Master to report to MOF Fisheries Communication Centre daily all information required of the vessel by MOF.

13.7.    The Owner shall require the Master of the vessel to accurately report all accidental death of marine mammals and marine turtles to the MOF Fisheries Communication Centre and will enter such accidents into the vessel's English Language Log Book stating the number caught, date of catch, position and time, and the circumstances of the incident.  This reporting will also cover the reporting of seabird death if it becomes mandatory after the signing of this Agreement.

**14.    Catch**

14.1.    All catch caught handled and processed by the vessel pursuant to this agreement shall remain the property of the Charterer until sold or otherwise transferred to another party.

14.2.    The Owner and the Charterer shall ensure that the vessel has in place a risk management programme, or other satisfactory programme, approved and registered by MAF(Qual).  The Owner shall undertake all possible measures to ensure fulfilment of catch, grading and production programmes, as agreed with the Charterer.

14.3.    The Owner shall ensure efficient organisation of fishing operations to fully realise the fishing plan and by minimising port turnaround time.

14.3.1. Maximising time on the fishing grounds and minimising port turnaround time.

14.3.2. Efficient organisation to ensure maximum catch of fish and correct processing and grading of fish and fish products as agreed with the Charterer.

14.3.3. Ensuring maximum rate of discharge of all fish catch and fish products but not less than 10 metric tonnes per hatch per hour.

14.3.4. Timely supply of the vessel with fuel, water, provisions and other necessary supplies.

14.3.5. Developing new practices and instituting new systems to maximise recovery of, and returns on product to the mutual benefit of the Owner and the Charterer.

14.3.6. The parties shall consult each other to increase the efficiency of the vessel, to increase the output of fish product indicated in the existing production programmes, and to establish new quality standards for production, packaging and marketing of fish product.

14.4. The Charterer shall use its best endeavours to facilitate the fulfilment of catch and production programmes as follows:

14.4.1. Minimising the time taken to obtain fishing permits for the areas referred to in Appendix II hereto.

14.4.2. Minimising catch and fish product discharge times at agreed ports.

14.4.3. Minimising time for obtaining additional ACE for vessel.

## 15. Fish product

15.1. The Owner shall ensure the production of fish products on board the vessel shall be in accordance with specifications agreed on by both parties and in accordance with the best industry standards and practices.

15.2. The Charterer shall have the right to appoint qualified surveyors to survey all fish or fish product upon discharge from the vessel, but the Owner shall not be liable for claims in respect of allegedly off-specification or otherwise spoiled fish or fish product unless supported by such a discharge survey report.

15.3. The catch and product shall be stored while on board the vessel and on shore using best industry standards and practices and also in accordance with any instructions issued by the Charterer in any case so as to fully preserve the catch and product in best possible condition and to prevent loss, deterioration or wastage.

## 16. Charter fee

16.1. The charter fee payable by the Charterer to the Owner shall be that part of the catch or the proceeds from the sale of the catches of the vessel as is agreed upon by both parties in the Fish Sale Agreement entered into

contemporaneously with this Agreement (or as may subsequently be amended or substituted by further agreement of both parties).

16.2.  The Owner shall keep a written record separating that part of the charter fee that is attributable to the operation of the vessel from that part that are attributable to the provision of personnel including crew.

16.3.  The Charterer shall be entitled to retain from the sale of fish or monies payable by it towards the charter fee any monies that may be expended by it with the prior written consent of Owner to meet Owner's obligations.

## 17.    Operating costs

The Owner shall pay all operating costs including:

17.1.  Administrative and Financial costs:

17.1.1.  Fees for the MOF Fishing Permits for the quota areas referred to in Appendix II hereto and fees for MOF Certificate of Registry for the vessel.

17.1.2.  MSA Survey Certificate, Manning Exemption, or Radio Survey Certificates (if required).

17.1.3.  Costs of obtaining charts and nautical publications to comply with New Zealand regulations.

17.1.4.  Provisioning and on board expenses of New Zealand Government observers and the Charterer's representatives.

17.1.5.  Fishermen's Association fees for officers and crew.

17.2.  Port calls:

17.2.1.  Port costs incurred in connection with vessel's departure for and arrival from the fishing grounds; and

17.2.2.  Costs of port calls for the vessel where such port calls are solely for the purpose of landing Charterer's fish products, except where the vessel discharges only fishmeal for Charterer's account at the time of bunkering the costs of that port call be shared equally.

17.3.  Operational Costs:

17.3.1.  All bunkers, lubricants, provisions, packaging materials and other miscellaneous supplies.

17.3.2.  Port charges, harbour dues, marine safety charges, oil pollution levies, pilotage, garbage disposal, linesmen, communication, agency, stevedoring and other vessel costs at New Zealand ports where port calls are made for provisioning, collection of packaging materials, bunkering, other supplies and repairs.

17.4.  Quota, ACE and Deemed Value charges on catch caught in addition to Appendix II and prearranged with Owner.

17.5.  Other miscellaneous costs incurred in New Zealand in connection with the importation of the vessel (including Customs duties and GST) into New Zealand and the Charterer's use of the vessel in New Zealand, other than the costs referred to in Clause 17.

17.6.  Costs and expenses incurred in bringing the vessel, fishing gear and fish processing equipment up to the New Zealand MSA and MAFQual certification standards.

17.7.  Costs of maintaining the vessel and equipment in survey or to the standard required in terms of this agreement.

17.8.  The Owner shall also pay:

  17.8.1.  Master's and Crew's wages and repatriation costs of employees.

  17.8.2.  Costs of obtaining and maintaining visas and work permit status of vessel's officers and crew and any related insurance costs.

  17.8.3.  Salvage, towage and wreck removal costs.

  17.8.4.  Costs and expenses including penalties in respect of Pollution of new Zealand waters (as that term is defined in section 2 of the Marine Pollution Act 1974).

  17.8.5.  Costs and expenses including penalties in respect of breach of the provisions of the Fisheries Act 1983, its subsequent amendments and any regulations made thereunder, the Territorial Sea and Exclusive Economic Zone 1977, any subsequent amendments and regulations applicable to the fishing operation except where such breaches are occasioned by the Charterer.

  17.8.6.  Reimbursement of Charterer's direct losses arising from any forfeiture of ITQ or ACE by the Charterer due to breaches by Owner of any Acts or Regulations agreement except where such breaches are occasioned by the Charterer.

  17.8.7.  Costs and expenses arising out of damage or injury or loss to any other vessel or marine structures of any nature or to any person or property except where such damage, injury or loss is occasioned by the Charterer.

  17.8.8.  Any Quota purchase, ACE and Deemed Value charges on ITQ for species caught in addition to that provided in Appendix II where such catching is not prearranged with the Charterer.

  Save that none of the costs referred to in this Clause shall be claimable as a deduction from the charter fee unless they have been notified to and approved by Owner prior to payment by Charterer and the Charterer has subsequently provided proof of payment.

**18.  Insurance**

18.1.  The Owner shall obtain and maintain full Hull and Machinery, and Protection

and Indemnity insurances for the vessel and appropriate insurance for the officers and crew as may be required by law.

18.2. On request by the Charterer, the Owner will provide full details (including copies of all policies or cover notes) of current insurances.

## 19.    Indemnity

The Owner shall bear all risks and costs relating to all acts and things contemplated by this agreement and indemnifies the Charterer, its holding company and every subsidiary and related company of the Charterer and the shareholders and directors of these companies against all costs, expenses, claims, fines, damages, amounts paid in settlement liability and losses of all kinds, whether monetary or otherwise incurred by the Charterer or such other companies arising out of any act, neglect or default of Owner, the vessel, their master or crew including, without limitation, costs and losses in respect of:

19.1. Loss, damage or injury to any vessel or marine structure of any nature or to any property or persons;

19.2. Pollution of New Zealand Waters as defined by s 2(2) of the Marine Pollution Act 1974;

19.3. Any breach of:

19.3.1. the Fisheries Act 1996;

19.3.2. Territorial Seas and Exclusive Economic Zone Act 1977;

19.3.3. any other statutory provision now or then relating to the activities to be carried out pursuant to this Agreement;

19.3.4. all other regulations and rules made under the statutory provisions referred to in paragraphs (i), (ii) and (iii) above;

19.3.5. any condition of any fishing permit applicable to operations carried out under this Agreement; and

19.3.6. this Agreement;

19.4. Any property, including any quota, belonging to or leased by the Charterer forfeited as a result for conviction for any offence;

19.5. All fines, Court costs, witnesses' and interpreters' fees, Crown solicitor fees and Crown charges which may be imposed on the Charterer;

19.6. All legal costs calculated on a solicitor and client basis, and all administrative costs incurred by the Charterer in connection with:

19.6.1. any investigation by a Government department or official agency or prosecution against the Charterer or Owner for any offence arising in respect of any matter related to the operation or fishing activity of the vessel under this agreement;

19.6.2. all actions taken by the Charterer in protecting or maintaining its quota whether leased or owned and other property;

19.6.3. any enquiry or investigation into the fitness of the Charterer to be in the fishing industry or into its conformity with its licences either following conviction for an offence or otherwise under s 257 of the Fisheries Act 1996 or any other provision of the Fisheries Acts 1983 or 1996 or any amendment thereto or otherwise; and

19.6.4. any action taken by the Charterer in protecting its interests in the event of any prosecution against or investigation into Owner; and

19.6.5. any removal of wreck costs;

19.6.6. in respect of any losses or liability (civil or otherwise) arising as a result of the application of the law of any foreign jurisdiction to the operation of the vessel or arising as a consequence of the nationality of the Owner, master or crew.

## 20.  Payments

20.1.  The Charterer undertakes to transfer all payments due to the Owner under this Agreement to a bank account nominated by the Owner.

20.2.  The Owner undertakes to transfer all payments due to the Charterer under this agreement to a bank account nominated by the Charterer.

20.3.  All payments due shall be made within 7 days from date of a delivery/acceptance report.

20.4.  Either party may set off payments due from the other.

20.5.  Without prejudice to any other remedies either party may have, where any payment due to be made in terms of Clauses  20.1, 20.2, 20.3 and 20.4 is not in fact so made, the defaulting payer will be liable to the payee for interest on the outstanding sum at the rate of 10% per annum.

## 21.  Confidentiality

The terms of this Agreement and all matters arising there from shall be kept confidential between the Owner and the Charterer. No disclosures shall be made to third parties without the other party's prior consent.

## 22.  Force Majeure

22.1.  Should a *force majeure* event prevent the parties fulfilling the terms of this agreement, whether in whole or in part, the parties will use their best endeavours to negotiate varied terms intended to enable this Agreement to be fulfilled.

## 23.  Termination

23.1.  in the event that any statutory consent for the operation of the vessel or the fishing operation is refused the charterer may, at his election:

23.1.1.  Terminate this agreement on ten days written notice to the Owner; or

23.1.2.  Continue this agreement in respect of the vessel referred to in the schedule or such replacement vessels as may have been agreed prior

to the breach.

23.2. Either party may terminate this Agreement, immediately upon giving written notice, if the other party materially defaults in the performance of any obligation under this agreement and fails to cure such default within thirty days after written notice of it.

23.3. Termination shall not affect any rights or obligations arising or existing prior to the termination.

## 24.   Arbitration

24.1. Any dispute, controversy or difference which is not settled, arising out of or in relation to, this Agreement shall be finally settled by arbitration. The arbitration shall be held in Christchurch, in accordance with the Arbitration Act 1996. The arbitrator shall, failing agreement between the parties be appointed by the President of the New Zealand Law Society.   The finding of the arbitrator shall be final and binding upon the parties.

24.2. This Agreement is governed by the Law of New Zealand and the parties submit to the jurisdiction of the High Court of New Zealand.

## 25.   Extension and re-negotiation of the Agreement

25.1. Unless either party, by notice in writing, gives notice not later than 60 days prior to the end of the term of their intention to discontinue this agreement, then the charter of the vessel pursuant to this agreement shall be extended for a further period of 365 calendar days on the same terms unless the agreement is varied in accordance with clause 25.2.

25.2. The parties may jointly, at any time, vary the terms of this agreement. Any such variation must, however, be in writing and be incorporated by annexing any such changes as a schedule to this agreement.

25.3. No alteration or supplement to this agreement shall be binding unless in written form and signed by authorised representatives of both parties.

25.4. Any rights or obligations on the part of either the Owner or the Charterer which have accrued prior to expiry of the notice period for termination of this Agreement shall remain binding and enforceable.

## 26.   Appendices

Appendices as listed shall be an integral part of this Agreement.

26.1.  Appendix I        The vessel

26.2.  Appendix II       Quota Tonnages

26.3.  Appendix III      Catch Distribution

26.4.  Appendix IV       Fish Packing Standards

26.5.  Appendix V        Packaging Agreement

26.6.  Appendix VI       Government Taxes

## 27.   Effective Date

Notwithstanding the date of signature of this agreement the effective date thereof shall be 7 July 2005.

**28.    Assignment**

28.1    The Owner may, with the consent of the Charterer, assign its rights under this Agreement and may assign those obligations that are capable of being performed by the Assignee.

**29.    Notices**

29.1.    Notices or other communications to be given under this Agreement shall be given at the recipient's last known place of address (or such other address within New Zealand as that party may have specified in writing), and shall be deemed to have been duly given or made:

29.2.    in the case of a communication by letter on the third (3rd) day after being posted by mail, correctly addressed and stamped;

29.3.    if given by hand, on personal delivery to the recipient or to such address;  and

29.4.    in the case of a communication by facsimile or email when transmitted with no indication of incomplete transmission to the recipient's last known facsimile number or email address. In the case of notice by facsimile or email, the facsimile or email communication shall immediately be followed by the posting of, or delivery of an original notice as set out above.

29.5.    The notified addresses and facsimile numbers of the parties are as follows:

| | |
|---|---|
| **Owner:** | **Cook Island Charters Limited** |
| Address: | C/O Cook Islands Trust Company Limited, First Floor, BCI House, PO Box 141, Rarotonga, Cook Islands |
| Telephone number: | +682 245 38 |
| Facsimile number: | +682 245 39 |
| **Charterer:** | **Southern Storm Fishing Limited** |
| Address: | 84 Stanleys Road PO Box 31135 Christchurch |
| Telephone number; | 03 359 7200 |
| Facsimile number: | 03 359 7099 |

29.3   The legal addresses of the parties are as follows:

**Owner:**                              **Demise Charterer:**

| C/O Cook Islands Trust Company Limited | Southern Storm Fishing Limited |
|---|---|
| First Floor | 84 Stanleys Road |
| BCI House | Christchurch |
| Rarotonga | New Zealand |
| Cook Islands | |

**Dated at**                  **this**          **day of**                  **2005**

_____

**The Owner** *(By his duly authorised representative who warrants that he has the authority to enter into this agreement on behalf of the owner)*

**Dated at**                  **this**          **day of**                  **2005**

_____

**The Charterer** *(By his duly authorised representative who warrants that he has the authority to enter into this agreement on behalf of the charterer)*

# APPENDIX I

## The Vessel – Description and Classification

Details to be provided by telex or facsimile

**NAME:**       FV OYANG 97

**INTERNATIONAL RADIO CALL SIGN:**     2KU2069

**REGISTRATION NO:**     1145

**FLAG:**       Cook Islands

**PORT OF REGISTRY:**     Rarotonga

**OVERALL LENGTH:**     61 metres

**BREADTH:**       9.8 metres

**DRAUGHT:**       6.3 metres

**GROSS REGISTERED TONNAGE:**     644

**ENGINE MAKE:**

**FUEL:**       MDO

**KILOWATTS:**       1864.2

**HULL MATERIAL:**     Steel

**YEAR BUILT:**       1971

**MAXIMUM SPEED:**     12 knots

**SERVICE SPEED:**     11 knots

**MAXIMUM DURATION AT SEA:**     40     (DAYS)

**HULL COLOUR:**       Black

**SUPER STRUCTURE COLOUR:**   White

**FUNNEL COLOUR:**       Black

**VESSEL COMMUNICATION EQUIPMENT:**

    SARCO GMDSS     8500     2182 k HZ

## APPENDIX II

### Quota Tonnages

The Charterer agrees to make available as target species hoki (4000 tonne) and squid (5000 tonne) ACE for the 2004/2005 fishing year in the NZEEZ.

## APPENDIX III

### Split of Catch

Catch shall be distributed on the terms set out in the fish sale agreement.

## APPENDIX IV

### Fish Packing Standards

The Owner will ensure the grading and packing of fish and fish products on board the chartered vessel comply with the standards laid down in the reference manual supplied by the Charterer to the trawler at the commencement of the charter.

The grading of each species is reflected in the transfer prices in Appendix  to this agreement.

## APPENDIX V

### Packaging Agreement

This Appendix is an integral part of the charter agreement dated

I.      The Owner agrees to purchase and provide sufficient packaging of suitable
        quality for the fishing operations including:

      (a)      Empty fibre board cartons (export grade)
      (b)      Empty polythene bags
      (c)      Stapling machines, staples, rolls of tape, stamps and ink required for
             the closing and marking of cartons.

**APPENDIX VI**

## Government Taxes

1.    Should import duties be reintroduced on marine fuels and oils by the Government during the term of the charter, the parties to this agreement will consult regarding payment of such taxes.

2.    The New Zealand Inland Revenue (Tax) Department are currently investigating the current status of overseas fishing companies to determine their liability for tax in New Zealand.   The Owner will be expected to comply with any regulations that may be introduced.  The Charterer will keep them informed of any progress in these matters.

**Exhibit D**

# FAX 송신

★ To : President Myung Hwan Kim / Oyang Corp.(fax 1-323-737-8507 )

☆ From : Oyang Corp.

*Oyag Awenue fax*

★ Title : 일일업무보고

★ Date : 2005. 09. 5

★ Page : 15 Page (Including cover page)

☆ TEL : 02) 721 - 6573        FAX : 02) 720 - 7175

 오 양 수 산 주 식 회 사

우(100-101) 서울 중구 태평로 1가 76-3  //  Tel. (02) 721-6500 / Fax. (02) 722-7879

2005-09-02

| 선명 | 출항일 | 항차별 출항일 | 한계 (MT) | 영A | 대구 | 기장미 | 장어 | 영HG | 함북 | 입항지 | | | | 비 고 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | D/H 출항일 | 이월량 (MT) | FA | A | SBW | RA | 소계 | 수출 % | BLOCK | 영란 | 창란 | 이란 | 선상 재고 |
| OYH | 2005 5.19 | 입고이월 선상재고 금기누계 | 103 1,040 7,941 | 103 1,040 7,461 | 0 0 101 | 0 0 0 | 0 0 0 | 0 20 0 | 0 310 0 | 0 0 0 | 0 48 0 | 0 0 0 | 0 0 0 | 04/Sep.일 류터 스기 컬리브 전재예정 |
| OY2 | 2005 7.23 | 입고이월 선상재고 금기누계 | 61 800 1,726 | 60 796 1,722 | 0 4 4 | 0 4 4 | 0 0 0 | 0 0 0 | 0 0 0 | 0 0 0 | 0 0 0 | 0 0 0 | 0 0 0 | |
| 합계 | | 입고이월 선상재고 금기누계 | 164 1,840 9,667 | 164 1,835 9,183 | 0 4 105 | 0 0 0 | 0 0 0 | 0 20 0 | 0 310 0 | 0 0 48 | 0 48 0 | 0 0 0 | 0 0 0 | |
| A/S | | | | | | | | | | | | | | | |
| OY70 | 2005 7.21 | 입고이월 선상재고 금기누계 | 524 2,053 | 6 1,030 | 0 0 | 0 0 | 336 408 | 30 37 | 25 91 | 11 24 | 27 149 | 0 0 | 89 314 | ETA 리블틴 05/Sep. |
| OY77 | 2005 7.31 | 입고이월 선상재고 금기누계 | 435 2,073 912 | 912 | 0 0 | 0 0 | 367 415 | 33 33 | 3 75 | 2 14 | 2 3 | 0 194 | 28 428 | ETA 리블틴 04/Sep. |
| OY96 | 2005 8.06 | 입고이월 선상재고 금기누계 | 328 641 | 7 5 | 0 0 | 202 | 18 | 9 | 0 7 | 0 40 | 0 0 | 179 | 52 102 | 03/Sep 리블틴 입항 ETD 리블틴 04/Sep |
| OY97 | 2005 8.13 | 입고이월 선상재고 금기누계 | 159 641 | 661 | 0 0 | 145 905 | 129 | 10 61 | 2 15 | 6 16 | 1 106 | 0 0 | 10 82 | |
| 합계 | | 입고이월 선상재고 금기누계 | 1447 5,709 | 7 2,607 | 0 0 | 1,334 | 1,034 | 92 111 | 39 208 | 26 70 | 70 259 | 194 | 179 925 | |
| S/C | 03.08.11 | 계약 개시일 | | | | | | | | | | | | |
| | 05.08.21. | 전체량 출항일 | SJ 0 | YF 0 | 한계 0 | SJ 15 | YF 95 | 한계 110 | 월간 누계 0 | SJ 2,635 | 금기누계 590 | 한계 3,225 | 조업중 | | 비 고 |

**Exhibit E**

# ☀ 오 양 수 산 주 식 회 사

120-707  서울특별시 서대문구 충정로2가 157  TEL : 02-721-6500  FAX : 02-721-6510

문서번호 : 경영기획팀 제 08- 012                                    2008. 10. 02.
수　　신 : OYANG AMERICA.Inc
참　　조 : President
제　　목 : 제97호 선박해체완료 통지의 건

　　　　1. 귀사의 번창을 기원합니다

　　　　2. 첨부와 같이 오양 제97호 선박을 해체완료 하였음을 통지하오
니 업무에 참고하시기 바랍니다.



첨 부 : 오양 제97호 해체관련 서류

# 오 양 수 산 주 식 회 사　대 표 이 사　이 명 성 

(별지 제22호 서식)

# 고 철 화 작 업 완 료 계

| 신 고 자 | 오양수산(주) | | 화    주 | 오양수산(주) | | |
|---|---|---|---|---|---|---|
| 신고일자 | 2008.06.26 | | 신 고 번 호 | 10313-08-060405U | | |
| 장치장소 | 동해조선(선기조합공단) | | 작업허가번호 | NO.08-1 | | |
| 품    명 | 규    격 | 작업개시일 | 작업완료일 | 종    량 | 비    고 | |
| VESSEL FOR BREAKING UP | 644,000KG | 2008.07.12 | 2008.09.18 | 559,076KG | | |

본인은 위의 물품에 대하여 수입통관사무처리에관한고시 제4-1-2조 제2항에 의거 고철화작업을 완료하였음을 보고합니다.

2008 . 9 .

신고인(화주)주소 : 서울시서대문구충정로2가157

성 명 : 오 양 수 산 (주)

부 산 세 관 장 귀 하

472-007-11 일
98. 7. 16 승인

210×297 ㎜
신문용지 54g/㎡

**Exhibit F**

五洋水産 (株)
## OYANG AMERICA INC.

SUBJECT : 오양 97호에 대한 정산 요청

ATTN : 오양수산 대표이사 이명성

안녕하십니까?

오양 97호는 2005년 당시 오양본사의 협조요청으로 미 시민권자인 본인 명의로

COOK ISLAND 에 CICL을 설립, 오양수산의 조업활동 편의를 봐주었습니다.

그 간 명의를 빌려주는 댓가로 이익금을 배당받거나 운영에 직 간접적으로

관여한 적도 없습니다.  다만 본인 명의로 COOK ISLAND에 개인적 투자 형태가
되버려 그에 따라 발생하는 미국 내 외 경비나 세금등에 대해서는 오양 본사에서
100% 책임져 주기로하고 2005년 9월부터 조업을 시작했습니다.

작년 초( 2007년 3월) 오양 본사와 1 년6개월간에 97호로 인해 미국에서 발생한

경비와 DUE등에 대해 논의를 하던 중 6월부터 오양 사태가 일어나 현재까지 그
건은 공중에 떠있었습니다. 사조에서도 오양인수 작업이 거의 끝났고 97호를 고
철 처분한 현 싯점에 그 간 마무리 짓지못했던 97호에 따른 정산을 부탁드립니다.

2005년 9월부터 2007년 5월까지 약 100억의 매출을 올린 것으로 자료를 갖고있
습니다. 내부적으로 확인을 하신후 빠른 시일 내 회신을 부탁드립니다.

2008 12월 2일

Kenneth Yoon

Oyang America,Inc

2017 년 6 월 6 일

SUBJECT :  오양 97 호 운영 경비 등에 대한 정산 요청

수신 :   사조오양  김 일식 사장 귀하

안녕하십니까?                    본인 윤경원은 지난 1992 년 부터 북 미주 지역에서
오양수산 창업주 이신  고 김성수 회장님의 부탁으로 오양 본사와 협조, 오양 제품과 각 종
수산물 등을 생산 또는 판매해 왔으며,      오양 본사의 Joint Venture 인 시애틀 소재 Arctic
Storm,Inc  오양 part 에 대해서도 회계정리 및 파트너 미팅, 회의 내용 등에도 관여,
조언을 해왔습니다.

 오양 97 호는 2005 년부터  2007 년 미국 오양 선적으로 등록해서 뉴질랜드와 쿡
아일랜드 해역에서  여러종류의 수산물을 어획, 오양 본사에서 100% 판매 및 수금
해왔으며 그 기간 97 호의 매출은 대략 100 억 이상으로 알고있습니다.    2007 년 5 월 경
그러한 매출에 따라 선주인 미국 오양에서  필요한 경비, 세금, 또한 여러가지 due 에 대해
오양 본사와 논의를 하던중 소위 2007 오양사태가 발생했고 , 공식적으로는 사조에서
126 억에 고 김성수회장님의 주식을 습득하며 , 오양수산과 그에 속해 있는 Arctic Storm
등의 경영권을 취하게 되었습니다.                그 후, 2008 년 12 월, 2009 년 초
당시 오양수산의 대표이사로 등재돼 있던 이명성 사장께 우편 및 Fax 를 통해 정산 문의를
보냈고 답변을 기다리고 있었으나, 아직까지도 아무런 언급이 없어 다시금 문의를
보내드리는 바 입니다.          내부적으로 확인을 하신 후 , 빠른 시간 내 이러한 적폐를
청산할 수 있도록  회신 부탁드립니다.

 Regards,

 윤 경원 ( Kenneth Yoon )

 1611 Cordova st.  Unit B1     LA, Ca 90007      USA      1-213-216-9075

 첨부 :  오양 97 호  3 분기 어획 누계  as of  2005 년 9 월 8 일

2017 년 7 월 12 일

SUBJECT :   오양 97 호 운영 경비등에 대한 정산 요청 2

수신 : 사조오양 김일식 사장 귀하

안녕하십니까?

지난 6 월 6 일 자로 오양 97 호 정산에 대해 두 번이나 우편물을 송부 했는데도

아직 아무런 회신이 없어 다시 한 번 보내드립니다.

오양 97 호는 지난 번 말씀드린 기간 동안 통계를 보니 87 억 여원의 매출을 올렸습니다.

이에 따라 매출의 25%인 21 억 8 천 만원에 상당하는 금액을 받을 권리가 있는 것으로
계산이 나왔습니다.      2017 년 7 월 30 일 이전까지 조치를 취해주시기 바랍니다.

Regard.

윤경원 (Kenneth Yoon)

1611 Cordova St. Unit B1  LA, Ca 90007  USA      1-213-216-9075



수신 : 사조산업 김정수 사장

눈 하나 까딱 안한다는 집단에서 주진우의 오른 팔로 활약하고 있다기에 알려드리지요.
무슨 일이 있어도 눈 하나 까딱 안 하는 이유를 알아보니  역시나 주변의 모든 권력 기관을
포함 언론계에도 뿌려댄 어마어마한 보험료의 효능이라 굳게 믿고 있는 듯 하군요.    여,
야를 넘나들며  노정권 말기 청와대의 변 모 수석을 위시해 , MB 정권 때는 이 모 의원 , 박
정권 때는 최 모의원 등... 다시 또 변 모씨의 끄나풀 재 등장 등..     사조는 대한민국
역사상 유례를 찾아 볼 수없는, 허가받은 날 강도 집단 그 자체입니다.      나는 2007 년
6 월 오양 사태가 나기 몇 개월 전부터 당신들을 지켜보아 왔습니다.   그 해 초 사조에서
오양을 인수한다는 헛 소문이 퍼져 진원지를 알아보니,   당신들과 결탁한 오양수산
창업주인 (고) 김성수 회장님의 셋 째사위 문영식과 첫째 사위 부산 고검장 박상길
이었지요.    설마하고 끝까지 조사를 해보지 않은 내 잘못도 컸지만,    무엇보다도 저
평가돼있던 수 천억 가치의 오양수산 주식 24% 를 단 126 억에 공식적으로는 박상길
등으로부터 인수했고 , 검은 돈 수 백억을 만원 권으로 그들에게 건넨 기억은 아직도
생생할 거라 믿습니다.    5 만원 권이 당시 있었다면 부피가 적어 그리 노출되지는 않았을
겁니다.

오양을 강탈해간 이후에도, 사조에서는 낯 부끄러웠는지 회사 이름도 사조오양으로 슬쩍
바꿔놓았고,  광화문 소재 싯가 3,000 억이 넘는 오양 본사의 타  사조 집단의 담보로
끼워넣었으며 오양 97 호는 저 가에 고철 처분, 오양 70 호 와 오양 77 호는 선원 성 추행
등 인권유린, 불법 어업 행위 등에다 벌금 미납등으로 전 세계적으로  나라 망신은 물론
오양의 이름까지 더럽혀 왔습니다.

오양에 몸 담았다 사조에서 해고된 수 천 명의 임 직원들 가슴에 멍을 들이는 행위 이기도
합니다.     그리고 마침내 2014 년 12 월 오룡호 침몰로 50 여 명의 아까운 희생자까지
내게되었지요.       충분히 막을 수 있었고, 100% 인재였다는 것도 당신들은 더 잘 알고
있습니다.    사고 발생 3 년이 다 된 지금 해수부에 지원 자금 414 억원만 달랑

반납하고는 누구 하나도 처벌 받은 자가 없습니다..    이 것이 바로 당신들이 주장하는
눈 하나 깜짝 안하는 보험료 덕분입니까?    아니면 시간을 질질 끌다 흐지부지 뇌리에서
사라지기만 기다리십니까?    그런 일은 절대 일어나지 않을 것입니다.    아주 많은
사람들이 지켜보고있고,    이 사건 만으로도 당신이나 주진우나 모두 이 사회에서
영원히 격리될 수 있는 중대 범죄 행위입니다.

그 뿐만이 아니지요.    외압으로 불법 증여에대한 수사의 중단,  화인 코리아를
도둑질해 올 때 막아보려던 창업주 사장님의 피눈물 나는 사연... 불법으로 해표산업
공장부지를 아파트 부지로 둔갑 시키려는 시도 등..    인터넷 공간만 일부 들여다
봐도 당신들이 쌓아온 더러운 적폐는 이루 헤아릴 수 없을 정도입니다.
결론적으로 당신들이 해오고 있는 행위들은 기업의 탈을 쓰고 저지르는  도둑질과
비리, 야합, 공갈, 뇌물 수여, 포괄적 뇌물 수여 등 ..    어느 하나도 기업으로써 절대로
해서는 안될 적폐 그 자체입니다.    내 말이 틀리다 생각하시면 법무 팀과 상의해서
고소하십시요.    그래야 나도 맞 고소 들어갑니다.


지금 이 순간 부터라도 잘 생각해 보고 회개하십시오.    아직 늦지는 않았습니다.
도둑질 한 것 돌려주고, 사과하고, 위로해 주고, 사랑으로 감싸주시면  각 종 보험료 지불
안 해도 됩니다.    그 돈으로 자선 단체에 기부해 보십시요.    새로운 사조로 거듭나고
존경 받는 기업이 될 수 있습니다.

김정수 사장도 보람을 느껴보실 수 있을 것입니다.      9.15.2017


윤경원 ( Kenneth Yoon )

1611 Cordova St # B1    L.A., Ca 90007    213-216-9075   oyangmbc@yahoo.com

수신 : 사조산업 김정수 사장님

참조 : 사조 주진우 회장님

Subject : 오양 97 호에 대한 정산 요청

안녕하십니까?          본인  윤경원은 지난 2017 년 6 월 6 일과 7 월 12 일
사조오양의 김일식 사장께  본인 명의로 100 여억원의 매출을 올린 오양 97 호의 매출에
따른 정산 대금 21 억 8 천 만원을  두 차례에 거쳐  송금 요청했지만  아직까지 송금이
이뤄지지 않고 있습니다.          빠른 시일 내 조치를 취해주시기 바랍니다.

2018 년 2 월 1 일

윤 경원 ( Kenneth Yoon) & Yoon family

1611 Cordova St.  unit B1        LA, Ca 90007          213-216-9075

oyangmbc@yahoo.com

Registered mail 접수.

# Exhibit G

## LAW OFFICES OF SIMON CHANG & ASSOCIATES
### A PROFESSIONAL CORPORATION
3200 WILSHIRE BLVD., STE. 1201, LOS ANGELES, CA 90010    <u>Via Email and U.S. Mail</u>
Tel:800-481-2215    Fax:800-481-2259
<u>simonchangesq@gmail.com</u>

August 14, 2018

Jinwoo Joo
Sajo Building
107-39, Tongil-ro, Seodaemungu
Seoul, Republic of Korea

**Re: Letter of Demand for Payment**

Dear. Joo:

Our offices, Law Offices of Simon Chang, represents Kenneth Yoon ("Yoon"), to whom you are indebted in the total amount of $2,946,000.00. On April of the year 2005, you and your company entered into agreement with Yoon regarding the purchase of the Oyang 97 fishery vessel in Cook Islands. Yoon has purchased the vessel under his name, while you have controlled full operation, vessel management, and the sales of catch. The agreement was made that Southern Storm, aka. Oyang Corp., would take full responsibility of all taxes and dues owed to the US by Oyang 97 in exchange for using Yoon's name for the purchase and operation only by face.

In the midst of discussing relevant Oyang 97's accumulated taxes and dues in early 2007, you and Sajo Group took over Oyang Corp., including Southern Storm and Oyang 97. In this process, Yoon was forced to sign over the possession of Oyang 97 which you have disposed for scrap. The taxes and dues owed have since been unsettled without anyone taking responsibility.

Our client, Yoon, has attempted to reach out to you several times by sending you multiple demand letters on December 2, 2008, June 6, 2017, July 12, 2017, September 15, 2017, and February 1, 2018. You have failed to respond in any way. Here, Yoon, is requesting you make the full payment by August 31, 2018.

If this matter is not resolved by the time specified above, our office on behalf of our client reserves the right to commence legal proceedings to recover the debt immediately without further notice to you and this letter may be tendered in court as evidence of your failure to pay. Hopefully this recourse is not necessary, but my client has his own interests to protect and will vigorously do so.

Please call us at (800) 481-2215 or contact our office through <u>simonchangesq@gmail.com</u> **within 15 days** if you wish to discuss this matter further or if you have any questions or concerns.

If you are represented by counsel in this matter, please forward this correspondence to your attorney and notify us immediately of such representation.

Sincerely,

Simon Chang, ESQ
Attorney at Law